**PRIESTER MACHINERY CO., Inc.,**
**Plaintiff,**

**v.**

**UNITED STATES of America,**
**Defendant.**

**HERTZ EQUIPMENT RENTAL CORPORATION, Successor by Merger to Contractors Equipment Company, Plaintiff,**

**v.**

**UNITED STATES of America,**
**Defendant.**

**Civ. A. Nos. C-68-76, C-68-77.**

United States District Court
W. D. Tennessee, W. D.

Feb. 12, 1969.

W. Stuart McCloy, McCloy, Wellford & Clark, Memphis, Tenn., for plaintiffs.

Thomas L. Robinson, U. S. Atty., Memphis, Tenn., Sherin V. Reynolds, Atty., Tax Division, Dept. of Justice, Washington, D. C., for the United States.

## MEMORANDUM OPINION

BAILEY BROWN, Chief Judge.

These are actions filed by Priester Machinery Co., Inc. and by Hertz Equipment Rental Corp. (the latter as successor by merger to Contractors Equipment Co.) against the United States to recover income tax refunds. Both the plaintiffs and defendant have filed motions for summary judgment. Since the only issue in each case appeared to be the same, the cases were consolidated and the motions

were heard at the same time. The record before the Court on these motions consists of the pleadings with exhibits, interrogatories and answers thereto with exhibits, joint stipulation, a deposition taken in another but similar case, and the motions with affidavits attached thereto. We have been furnished full memorandum briefs by both sides. At the hearing on the motions, since the facts of each case are so similar and since the applicable law is the same, counsel agreed that either both of the plaintiffs' or both of the defendant's motions should be granted.

Priester Machinery Co., Inc. (hereinafter "Priester") is a Tennessee corporation whose business was and is the sale and servicing of heavy road building equipment. Contractors Equipment Co. (hereinafter "Contractors") was a Tennessee corporation whose business was the leasing of such equipment. During the involved tax years, Milton F. Priester was the president of both corporations and owned all of the stock of Priester and also owned all of the stock of Contractors except during the last tax year when he owned seventeen out of its twenty outstanding shares. After the involved tax years, on July 28, 1965, all of the stock of both corporations was sold to Hertz Corp., which then merged Contractors into Hertz Equipment Rental Corp.

With respect to Priester, the involved tax years are those ending March 31, 1962 through March 31, 1965, and with respect to Contractors, the involved tax years are those ending September 30, 1961 through September 30, 1964. The deficiencies, the payment of which with interest gave rise to these refund actions, all resulted from the disallowance of deductions taken as interest deductions. The source of these deductions was the payment of amounts claimed by the taxpayers to be interest on loans made to them by a life insurance company which loans were used by taxpayers to pay and prepay premiums on policies issued

to them on the life of Mr. Priester. Since the facts in each case are so similar and raise the same legal questions, we will set out the facts with respect to Priester in some detail and then indicate the few differences in the facts with respect to Contractors.

In 1958, Priester applied to The Franklin Life Insurance Co. (hereinafter "Franklin") for a policy on the life of Mr. Priester. The purpose of obtaining such insurance was the usual one for obtaining "key man" insurance, i. e. to provide a cushion in the event of the loss of Mr. Priester's services, and such insurance was suggested by a local bank with which Priester was making regular and substantial loans.[1] Effective October 17, 1958, Franklin issued a policy on Mr. Priester's life to Priester, which during the involved tax years remained the owner and beneficiary of the policy. Under the terms of the policy, the death benefits would increase annually from $108,700 in the first year to $274,000 in the twentieth year and would thereafter so remain. The annual premium was $7,842 for the first twenty years and thereafter was $2,842. The policy was called a "whole life, increasing death benefit policy."

With the issuance of the policy, Priester chose to execute a "Loan Agreement and Assignment of Policy." Pursuant to its rights under the policy and the agreement, Priester then concurrently (1) paid the first annual premium of $7,842 and then prepaid four succeeding annual premiums (discounted at 3%) in the amount of $29,149.50, or a total premium of $36,991.50, by (2) borrowing from Franklin the then full loan (i. e. cash) value of the policy of $35,023.88 and by (3) paying in cash the difference between the total of these premiums and the loan, which was $1,967.62. Priester at that time also prepaid in cash a year's interest on the loan at 4%, which was $1,400.96.

At the beginning of the next policy year, on or about October 17, 1959,

1. The policy issued on this application was later pledged to the bank.

Priester prepaid the premium for the sixth policy year (discounted at 3%), which was $6,967.62, by concurrently borrowing from Franklin that amount of the increased loan value. It also then prepaid in cash the interest on the entire and now augmented loan for one year at 4%. At the beginning of the succeeding policy years and through the involved tax years, Priester followed this same practice. That is to say, it prepaid the premium for the policy year beginning four years hence (discounted at 3%) by concurrently borrowing from Franklin that amount of the increased loan value; and it prepaid the interest in cash for one year at 4% on the augmented loan.

The death benefits were substantially greater in the first year and would have continued, under this plan, to be substantially greater in all subsequent years than the amount of the loan to Priester. Moreover, beginning with the second policy year, the *net* cash value of the policy (i. e. the cash or loan value less the amount of the loan) grew from $354.38 to, in 1965, $4,225.68 and, further, at the end of the twentieth policy year would have been $24,703. Subsequent to the initial transaction in 1958, it was never necessary and Priester did not pay any more cash to Franklin to cover any premium. Priester had no corporate liability with respect to such loans, but Franklin was secured by the cash value and death benefits of the policy. Priester could not borrow from the bank at an interest rate as low as 4%. Franklin treated the cash interest payments on its books and on its tax returns as interest income and treated the premiums paid by the loans on its books and on its tax returns as premium income. Mr. Priester's life expectancy when the policy was issued was 26 years.

The facts with respect to the Contractors policy obtained from Franklin are the same as in the case of the policy obtained by Priester with the following exceptions. This policy was issued effec-tive March 12, 1961 and the above-described transactions with respect to this policy began at that time. Since the age of the insured, Mr. Priester, had increased from 44 to 46, the death benefits, premiums, amount of loans, interest payments, and net cash values were slightly different. This policy was never pledged to the bank. Mr. Priester's life expectancy when the policy was issued was 24 years.

At the time the stock of Priester and Contractors was sold to Hertz Corp. on July 28, 1965, Mr. Priester purchased these policies from these corporations at their fair values.

As indicated, both Priester and Contractors, for each of their involved tax years, took a deduction for the interest paid by them to Franklin during that year, and it is the disallowance of these deductions that is at issue.

It is the contention of the Government that these payments to Franklin were not deductible as interest because they were not payments of interest on an indebtedness within the meaning of I.R.C. § 163(a), which provides:

"Sec. 163. INTEREST.

(a) *General Rule.*—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

The Government further contends that, since these payments were not deductible as interest, they were not, in view of I.R.C. § 264(a) (1), deductible at all. This section provides that premiums paid by a taxpayer on a life insurance policy on the life of an officer of or one financially interested in the taxpayer, when the taxpayer is a beneficiary of the policy, are not deductible.

It is the alternative contention of the Government that, even if these payments were payments of interest within the meaning of § 163(a), they still are not deductible because interest paid on an indebtedness incurred or continued to purchase or carry a single premium life in-

surance policy cannot be deducted and because, within the meaning of the Code, this was a single premium policy. In this connection, the Government relies on § 264(a) (2), which provides:

"SEC. 264. CERTAIN AMOUNTS IN CONNECTION WITH INSURANCE CONTRACTS.

(a) *General Rule.*——No deduction shall be allowed for—

\* \* \* \* \* \*

(2) Any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or annuity contract."

and further relies on § 264(b) (2), which provides:

"(b) *Contracts Treated as Single Premium Contracts.*—

For purposes of subsection (a) (2), a contract shall be treated as a single premium contract—

\* \* \* \* \* \*

(2) if an amount is deposited after March 1, 1954, with the insurer for payment of a substantial number of future premiums on the contract."

Taxpayers contend, on the other hand, that the involved payments were interest payments within the meaning of § 163 (a).[2]

Taxpayers further contend that these interest payments were not paid to carry a single premium policy as such is defined in § 264(b) (2).

It should be obvious that this ingenious plan had substantial tax advantages for taxpayers if they were allowed to deduct these payments as interest payments. However, simply because the plan is ingenious and would, if successful, allow taxpayers to avoid some federal income taxes should not raise the judicial hackles.[3] We approach the tax effectiveness of this plan, therefore, without prejudice arising from the ingenuity of the plan or the revenue loss that the plan would create.

In support of its contention that these payments were not payments of interest within the meaning of § 163(a), the Government primarily relies on the majority opinion in Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). Taxpayers, on the other hand, primarily rely on Campbell v. Cen-Tex, Inc., 377 F.2d 688 (5th Cir. 1967). *Cen-Tex*, it was agreed at argument, presented facts that are no different for present purposes from the facts in the instant cases and the court there distinguished *Knetsch* and held that the payments to the insurance company were interest payments within the meaning of § 163 (a). The issue, then, as we see it is whether the facts presented here (and which were presented in *Cen-Tex*) support, under the holding in *Knetsch*, a different result than that reached in *Knetsch*.

In *Knetsch*, it was clear that taxpayer's only motive in purchasing the annuity bonds was to acquire an interest deduction, but the majority opinion put aside the motive of taxpayer as being irrelevant. It is quite permissible, the opinion said, to decrease or avoid taxes; the question, it said, was whether what was done, aside from tax motive, was what the statute intended in allowing an interest deduction. The opinion then held that what was done was a "sham," that it had no "substance" and therefore that it was not what the statute intended

---

2. Taxpayers say that when these deductions were disallowed, the Government's only position was that they were interest payments made to carry a single premium policy, but taxpayers do not claim that the Government is therefore estopped now to contend that the payments were not interest payments.

Taxpayers agree that if these were not interest payments within the meaning of § 163(a), the deductions were properly disallowed.

3. Though such no doubt should, as it later did, raise the hackles of Congress, which plugged this loophole, as will be seen, by enacting § 264(a) (3).

because taxpayer's transactions with the insurance company did not materially affect taxpayer's beneficial interest except to reduce his income tax by his taking the interest deduction. This was so, the opinion stated, because taxpayer's borrowing from the insurance company was such that his net cash value in the annuity bonds, on which annuity payments would depend, remained a "relative pittance." Here (and in *Cen-Tex*), on the other hand, the death benefits of the insurance policies were and would always be substantially greater than the loan and, further, taxpayers were acquiring substantial and increasing *net* cash values in the policies. In addition to making the foregoing distinction, the Court in *Cen-Tex* also pointed out that, different from *Knetsch*, the taxpayer had acquired the insurance policies for a business purpose—to meet its obligations under a deferred compensation plan and a stock option plan. Here taxpayers likewise acquired the insurance policies for a business purpose—to provide a cushion in the event of the loss of Mr. Priester's services and to facilitate the making of business loans with the bank. In so pointing to this business purpose, perhaps the Court in *Cen-Tex* impliedly indicated the view that, in spite of its disavowal of the relevance of purpose or motive, the majority opinion in *Knetsch*, was influenced by the fact that there tax avoidance was the sole purpose of taxpayer's acquiring the annuity bonds.

It is therefore clear to us, as was clear to the Court in *Cen-Tex*, that, applying the test stated in the majority opinion in *Knetsch*, taxpayer's transactions in the instant cases were not sham. However, this interpretation of *Knetsch* is somewhat clouded by the fact that certiorari was granted in *Knetsch* (in which the Government had prevailed below) because "of a suggested conflict with"

United States v. Bond, 258 F.2d 577 (5th Cir. 1958) (in which taxpayer had prevailed below), and in *Bond,* different from *Knetsch,* taxpayer's transaction had "substance" in that he *was* acquiring substantial cash values in the annuity savings bonds there involved. In *Cen-Tex* the Court recognized again, as it had earlier recognized in United States v. Salley, 290 F.2d 708 (5th Cir., 1961), that, in view of *Knetsch, Bond* was no longer authority. It was, perhaps, a recognition that the Supreme Court, in so disapproving *Bond,* was moving beyond the very "substance" test that it was then applying in *Knetsch* that caused the Court in *Cen-Tex* to rely on the additional point of the presence of business purpose in acquiring the insurance policies. In any event, while we recognize the above-described complication introduced by the Supreme Court's apparent disapproval of *Bond,* we can only (1) rely on what that Court *said* in *Knetsch* and, with the Court in *Cen-Tex,* (2) rely also on the presence here of business purpose in acquiring the insurance policies.[4]

Further, as also pointed out in *Cen-Tex,* in enacting, in 1964, I.R.C. § 264(a)(3), which definitely plugged this loophole but which was made applicable only to contracts purchased after August 6, 1963, the Senate committee report states the belief that, but for this added provision, payments such as in the instant cases may be deductible as interest payments. *Cen-Tex,* 377 F.2d at 690, note 3.

The Government contends that, even if the acquisition of these policies had "substance" within the meaning of the test applied in *Knetsch* and even if the policies were acquired for valid business purposes, this is not enough; it is necessary, the Government contends, that this very plan of paying the premiums—by borrowing from the insurance company—had a purpose other than tax avoid-

---

4. Taxpayers, as stated, had no corporate liability as to these loans. However, we do not consider such to be of significance here, because the same was true in *Knetsch* and the majority opinion did not give this fact any weight and further because taxpayers are normally allowed to deduct interest on loans as to which they are not liable but which encumber their property.

ance. Thus the Government here contends that not only is a motive of tax avoidance relevant but also that a motive to avoid taxes in the method used to finance these otherwise tax-valid transactions is sufficient to make them tax-invalid transactions. Ballagh v. United States, 166 Ct.Cl. 191, 331 F.2d 874, 878 (1964), cited by the Government, appears, in substance, to so hold, for the opinion seems to say that the method of payment of premiums must itself increase taxpayer's beneficial interest other than by reducing his tax and that payment by the use of loans, rather than by cash, does not increase such interest other than reducing tax. We do not understand that the cases go so far, and, further, the Court in *Cen-Tex* (377 F.2d at 692, note 7) cited *Ballagh* but thought it not applicable.

It should be said for completeness that in the instant cases taxpayers contend, as a factual proposition, that *Ballagh* in any event is not applicable because they had a business purpose in borrowing from Franklin to pay the premiums. They contend that the purpose in borrowing rather than paying cash was to conserve taxpayers' usable funds, and that the purpose in borrowing from Franklin rather than the bank was that Franklin offered a lower interest rate. We cannot, however, from this record be sure whether or not the borrowing to pay premiums here conserved the cash funds of taxpayers. We say this because the proper comparison would be between the amounts that were being paid in interest on the loans on the policies as written with amounts that would have been paid in cash on premiums on policies with death benefits and cash values that were smaller than under the policies as written but were equal to the net death benefits and net cash values under the policies as written. These figures simply are not available in the record, though we suspect taxpayers are correct in this

contention at least in the earlier policy years.

The Government also relies on Goldman v. United States, 273 F.Supp. 137 (W.D.Okl.1967), which has since been affirmed, 403 F.2d 776 (10th Cir. 1968). This case does present substantially the same insurance plan as in the instant cases and was decided for the Government. However, there the District Court, without citing authorities, simply found and concluded that these loans were not "bona fide" and that the payments "were not, in economic substance, payment for use of borrowed money * * *." On appeal, the Court of Appeals, in affirming, distinguished *Cen-Tex* on the ground that, from the record and the findings of the District Court, it did not appear that there was any business purpose either in the acquisition of the policies or in the payment of the premiums by the use of loans from the insurance company. Thus the opinion of the Court of Appeals is based on different facts from those presented in *Cen-Tex* and here.

■ We therefore find and conclude that the payments in the instant cases were payments of interest within the meaning of I.R.C. § 163(a).

As stated, the Government contends that even if, as we have determined, these payments were payments of interest, they still were not deductible because they were paid on an indebtedness incurred or continued to purchase or carry a single premium life insurance policy (§ 264(a) (2)) and because these were single premium policies since an amount was deposited with the insurer for payment of a substantial number of future premiums on the policy (§ 264(b) (2)).[6]

The Government argues that these policies amounted in reality to a series of one-year term policies, apparently as a basis for further arguing that they were single premium policies under § 264(b)

---

6. The Government does not rely, in contending that these were single premium policies, on the definition of a single premium policy contained in § 264(b) (1).

**610**

(2). These were not, however, a series of one-year term policies, as is amply demonstrated in *Cen-Tex*, 377 F.2d at 693, because they were not issued for a specified term with benefits payable only in case of death during the term and because they had reserve values.

The real question, then, under § 264 (b) (2) is whether it can be said that an amount was deposited with the insurer for payment of a *substantial number* of future premiums. This question is fully discussed in *Cen-Tex*, 377 F.2d at 688–689. The Court pointed out that subsequent to the first year, only one future premium was paid by each deposit. In the first year, it pointed out, only four *future* premiums were paid with the deposit. In determining whether four is a "substantial number," the comparison is to be made, the Court said, with the total number of premiums that are expected to be paid, which in turn is to be determined by the life expectancy of the insured. This is, the Court indicated, a mixed question of law and fact, and it declined to overturn the finding of the District Court that a deposit of four future premiums was not a substantial number when related to expected future premiums of only fourteen.

In the instant case, Mr. Priester had an expectancy of 26 years when the Priester policy was issued and an expectancy of 24 years when the Contractors policy was issued. We find and conclude that the payment of four future premiums was not a payment of a substantial number of such premiums when compared with 26 or 24. We therefore further find and conclude that these were not single premium policies as defined in § 264(b) (2) and that therefore these interest deductions could not be disallowed under § 264(a) (2).

Counsel will prepare a judgment providing that plaintiffs are entitled to recover the deficiencies, with interest, heretofore paid, together with interest on these amounts from the date of payment.