David L. KENNEDY (88–1254),
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Joseph D. AUBERGER and Wanda Auberger (88–1255),
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Nos. 88–1254, 88–1255.

United States Court of Appeals,
Sixth Circuit.

Submitted April 18, 1989.

Decided June 5, 1989.

William Randolph Klein, Sarasota, Fla., for David Kennedy, Joseph and Wanda Auberger.

Gary R. Allen, Chief, U.S. Dept. of Justice, Appellate Section Tax Div., William S. Rose, Jr., Mary Francis Clark, Gilbert S. Rothenberg, Dept. of Justice, Washington, D.C., for C.I.R.

Before WELLFORD and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

RALPH B. GUY, Jr. Circuit Judge.

Petitioners David L. Kennedy and Joseph and Wanda Auberger appeal the United States Tax Court's decision finding them liable for 1978 and 1979 tax deficiencies. The petitioners claim that the Tax Court erred by (1) disallowing their mining expense deductions as a consequence of its erroneous finding that the gold mining tax shelter in which they invested was a sham entered into for tax rather than profit motives, and (2) procedurally prejudicing their case. We find that the petitioners' claims lack merit and, accordingly, affirm the Tax Court's determinations.

Both Kennedy and the Aubergers participated in a tax shelter promotion entitled "Gold For Tax Dollars" (GFTD) sponsored by the International Monetary Exchange (IME). Kennedy invested $5,000 in the program in 1979. The Aubergers invested $4,000 in the promotion in 1978 and $4,000 again in 1979. The details of this promotion are discussed thoroughly in the Tax Court's opinion.[1] In brief, the promotion offered investors the opportunity to lease small plots of gold bearing land in gold mining concessions in Panama (in 1978) and in French Guiana (in 1979 and 1980). Investors were not charged for IME's services in procuring leases or for the leases themselves. Instead, the taxpayers acquired the leases by paying cash plus the proceeds from non-recourse notes (in 1978) or the sale of options (in 1979 and 1980)[2] to develop the mines. IME lured investors by heavily promoting the availability of immediate tax deductions in substantial multiples of the taxpayers' initial investments. For example, in 1978 IME advertised a four hundred percent tax shelter to high income investors based on each investor borrowing $3.00 for every $1.00 of cash invested and on paying the total funds out as develop-

---

1. The Tax Court's decision, in *Gray v. Commissioner*, 88 T.C. 1306 (1987), *aff'd sub nom. Becker v. Commissioner*, 868 F.2d 298 (8th Cir.1989), encompassed the consolidated appeals of the Commissioner's findings of deficiency against nine taxpayers, including Kennedy and the Aubergers.

2. IME changed the mechanism through which a mining expense deduction was derived from non-recourse loans in 1978 to option arrangements in 1979 and 1980 because of a change in the tax laws that limited an investor's deductions to the amount for which he was at risk. *See* 26 U.S.C. § 465(a), (c)(3)(A).

ment expenses that same year. IME also claimed that taxable income would only be generated if gold was actually mined and that the investors would control if and when gold on their plot would be mined.

After calculating his desired tax deduction,[3] an investor would pay IME up front twenty-five percent of his desired tax deduction and IME, in 1978, would agree to lend him the remaining seventy-five percent on a non-recourse basis with ten percent interest per annum. IME, as the investor's agent, allegedly would pay the entire sum to a mining contractor hired to prepare the investor's claim to the point at which gold could be extracted. IME assured investors via literature and a tax opinion letter that this procedure would render each investor a "miner" in 1978 for federal income tax purposes, enabling him to deduct, pursuant to section 616(a) of the Internal Revenue Code (IRC), 26 U.S.C. § 616(a),[4] his initial sum *plus* the amount paid to the contractor as mine development expenses.

The 1979 and 1980 tax shelters essentially operated in the same fashion; however, an option arrangement was substituted for the non-recourse loan to the investor to preserve the deductibility of the expenditure. The investor again would invest cash equal to twenty or twenty-five percent of his desired tax deduction for that year. IME, as the investor's agent, sold to a third party an option to buy gold extracted from the investor's individual plot. The option price equalled the remaining seventy-five to eighty percent of the desired deduction but the option was exercisable only after the gold had been extracted and investors controlled when gold would be extracted. Again, IME would pay the full sum to a mining contractor and the investor deduct-

ed his cash investment plus the option sale proceeds in 1979 and/or 1980.

An IRS survey regarding GFTD disclosed that from 1978 through 1980, 3,025 investors claimed mining expense deductions of approximately $118,619,444. Among those investors, Kennedy claimed a deduction of $17,795 based on his $5,000 initial investment and on $12,795 invested and funded by the sale of an option. The Aubergers claimed a deduction of $20,000 in 1978 based on a $4,000 cash investment plus $16,000 obtained through a non-recourse loan. Similarly, in 1979 they claimed a $20,000 deduction based on a $4,000 investment coupled with $16,000 in proceeds from an option sale.

After examining the petitioners' income tax returns, the Commissioner issued notices of deficiency to them that disallowed their claimed mining deductions. The Commissioner indicated that the petitioners failed to demonstrate that they had acquired an interest in any mineral property, that mining expenses were paid, and that the mining transactions had actually occurred as alleged. The petitioners sought a redetermination of their tax liability and, while their petitions were pending before the Tax Court, that court decided *Saviano v. Commissioner*, 80 T.C. 955 (1983), *aff'd*, 765 F.2d 643 (7th Cir.1985). In *Saviano*, the court considered the tax consequences of the GFTD financing procedures and concluded that the 1978 mining expenses funded via non-recourse loans could not be attributed to the investor for federal tax purposes because repayment of the non-recourse note was, by its terms, too contingent to establish a true debt. Thus, the amounts of the non-recourse loans were not deductible as mining expenses. Similarly, the court concluded that because the 1979 and 1980 option arrangement did not

---

**3.** The taxpayer determined the amount of land to be covered by his lease by dividing the amount of his desired tax deduction by $1.60 (the development cost per cubic meter). A deduction of $40,000 correlated to a lease on 25,000 cubic meters of auriferous gravel. For a more detailed account of the mechanism by which GFTD was operated, see the Tax Court's opinion at 88 T.C. 1306. *Armstrong v. Commissioner*, 869 F.2d 1496 (9th Cir.1989); See also

*Becker v. Commissioner*, 868 F.2d 298; *S.E.C. v. Rogers*, 790 F.2d 1450 (9th Cir.1986); *Saviano v. Commissioner*, 765 F.2d 643 (7th Cir.1985).

**4.** All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue unless otherwise indicated.

create an unconditional right of acceptance in the offeree, it was not a true option. Therefore, investors had to include option sale proceeds as income in 1979 and 1980. Displeased with the *Saviano* ruling, which was rendered on cross-motions for summary judgment, petitioners in this case sought a trial to develop the facts more fully. Prior to trial, petitioners moved, unsuccessfully, to apply collateral estoppel or res judicata against the Commissioner on the basis of *S.E.C. v. Rogers*, 790 F.2d 1450 (9th Cir.1986). Thereafter, the petitioners' cases were consolidated with others for trial.

The Tax Court found that GFTD was a sham promotion that produced little more than a paper trail to support illegitimate tax deductions. The evidence disclosed that of roughly 3,000 mines leased by investors, only one was actually developed. The court recognized that the GFTD program here was identical to that in *Saviano* and, like the *Saviano* court, disallowed the mining expense deductions supported by the non-recourse loans and the option sales. Moreover, the Tax Court concluded that each taxpayer's initial cash investment was also an impermissible mining expense deduction because the GFTD promotion was not feasible as promoted, claimed expenditures were never made, and the investors never acquired any interest in mineral property.[5] In short, the Tax Court concluded that the promotion was a fraudulent sham and the investors were motivated by securing promised tax benefits and not by potential profit realization. Accordingly, the petitioners were also assessed increased interest, pursuant to 26 U.S.C. § 6621(c), for substantial underpayment attributable to tax motivated transactions. That provision was enacted pursuant to the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986).

## I.

We are cognizant that we are precluded from setting aside factual findings made by the Tax Court unless they are clearly erroneous. *See* 26 U.S.C. § 7482 (which renders Rule 52(a) of the Federal Rules of Civil Procedure applicable to review of Tax Court decisions). *Figgie Int'l, Inc. v. Commissioner*, 807 F.2d 59, 63 (6th Cir.1986); *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 629 (6th Cir.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). Legal determinations, however, are reviewable *de novo*.

Section 616(a) of the IRC, 26 U.S.C. § 616(a), permits taxpayers to deduct "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." To be a valid deductible mining development expense, the expense must have been paid to a mining contractor for its designated business purpose and not merely for tax avoidance. *See generally Keller v. Commissioner*, 725 F.2d 1173 (8th Cir.1984); *Parker v. Commissioner*, 86 T.C. 547 (1986). Notwithstanding petitioners' protestations to the contrary, there is no evidence showing that any amounts invested by the taxpayers were spent on mining development of their plots during 1978 or 1979. For example, the district court found that IME's expenses related to the Panama concession totalled $1,450 in 1978 and $49,500 in 1979 in contrast to investor claimed deductions of $13,012,329 for 1978 and $70,988,760 in 1979. Although the investors paid money to IME, there is no evidence showing that this money was, in fact, paid to a mining developer to develop their plots during the years at issue. That is, any development that was being done did not inure to the benefit of GFTD investors.

Pertinent treasury regulations provide that an actual interest in mining operations is necessary to deduct mining development expenditures. 26 C.F.R. § 1.616–1(b)(3). The evidence here supports the trial court's finding that the investors' mineral claim leases were fictitious. Accordingly, petitioners lack the requisite interest in the

---

**5.** The deductibility of the investor's initial cash outlay was not at issue in *Saviano*.

mining operation necessary to deduct their expenses. Mineral lease numbers were assigned sequentially as investors' checks were received by IME, without reference to any geographical plot location. Although some French Guiana plots were mapped on paper, the plots were inaccurate. With one exception, there was no evidence that any of the purported developers could associate a particular investor with a particular plot. The developers testified that they never received payment for mining a particular claim. At best, it can be said that 100–200 French Guiana plots were mapped out on paper in contrast to the 2,500 plots purportedly leased to IME investors in 1979.

The evidence also revealed that the mining program offered by the GFTD promotion was not at all feasible. GFTD promoted the lease of individual plots to be operated as sole proprietorships with each miner paying the development expenses for his claim. This "sole proprietorship" characterization of the program was necessary to avoid tax exposure as a partnership if the plots were characterized as undivided interests. Yet, expert testimony revealed that it would be futile or impossible to subdivide the mineral properties into the plots containing specific volumes of gravel as allegedly leased by miners. The expert testified that the cost of individual gravel processing was prohibitive and that an indi-

vidual plot, in isolation, has no commercial quantities of gold and no economic potential. Testimony also revealed that the investors' control over when mining would occur would be unworkable for a mining contractor and that the development expenses claimed by the investors vastly exceeded the amount allegedly spent on development or that would be appropriate for a mining site of that size. Hence, there is ample support for the Tax Court's conclusion that investors failed to acquire an interest in a particular mining property or operation. Moreover, given the court's finding that, in reality, the mining of the concessions was pursuant to a joint venture that excluded GFTD investors,[6] it was impossible for investors to actually acquire individual plots.

Our review persuades us that the Tax Court's characterization of the GFTD promotion as a fraudulent sham as well as its characterization of the investors' interests in that promotion were not clearly erroneous. Accordingly, petitioners are precluded from deducting any perceived mining expenses under IRC § 616(a) and are liable for tax deficiencies.

## II.

■ The Tax Court also found petitioners liable for increased interest pursuant to 26 U.S.C. § 6621(c),[7] which authorizes as-

---

**6.** The Tax Court found that while IME was selling tax shelters, the gold mining that did progress was pursuant to joint ventures between the principals of IME and other companies for their own benefit and not for that of GFTD investors. The GFTD program was the brainchild of Gerald Rogers of IME who sought to exploit gold mining concessions controlled by others by selling tax shelters tied to those concessions.

**7.** IRC § 6621(c) provides, in pertinent part:
   **Interest on substantial underpayments attributable to tax motivated transactions.—**
   **(1) In General.**—In the case of interest payable under section 6601, with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section.
   **(2) Substantial underpayment attributable to tax motivated transactions.**—For purposes of this subsection, the term "substantial un-

derpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.
   **(3) Tax motivated transactions.—**
   **(A) In general.**—For purposes of this subsection, the term "tax motivated transaction" means—
   (i) any valuation overstatement (within the meaning of section 6659(c)),
   (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),
   (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),
   (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and
   (v) any sham or fraudulent transaction.

sessment of interest at 120 percent of the established rate in cases of substantial underpayment of taxes attributable to tax motivated transactions. A tax motivated transaction encompasses "any sham or fraudulent transaction." IRC § 6621(c)(3)(A)(v). Although this section was added to the Code by § 1535(a) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2750 (1986), and made applicable to interest accruing after December 31, 1984, the Tax Court has found it constitutionally sound to apply the amendment retroactively. *DeMartino v. Commissioner,* 88 T.C. 583, 587 (1987), *aff'd,* 862 F.2d 400 (2d Cir.1988) (IRC section authorizing increased interest for substantial underpayment due to tax motivated transactions may be applied to an underpayment "even though the relevant income tax return was filed several years before the effective date of the section." *Id.* at 589 n. 13 (citing *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985)). *See also Patin v. Commissioner,* 88 T.C. 1086, 1127 n. 34 (1987) (rejecting constitutional challenge to retroactive interest penalty), *aff'd sub nom. Gomberg v. Commissioner,* 868 F.2d 865 (6th Cir.1989). Although petitioners contend that their participation in GFTD was profit motivated, the Tax Court found that their true motive was to reduce their tax liability. This finding also is not clearly erroneous. GFTD investors, including petitioners, were initially lured by IME promotional materials practically screaming of GFTD tax benefits for high income taxpayers. The participants were given detailed instructions on how to structure their investments based solely on the amount of their desired tax deductions. Whatever motives drove GFTD investors to participate, there is little doubt that tax motives were predominant. Because investments entered into primarily for tax benefits are not profit motivated, *Fox v. Commissioner,* 82 T.C. 1001 (1984), petitioners cannot avoid the Tax Court's increased interest assessment authorized by IRC § 6621(c).

### III.

Petitioners' remaining claims of prejudice are tied to the court's reliance on *Savi-*

*ano v. Commissioner,* 765 F.2d 643; its refusal to apply collateral estoppel or res judicata against the Commissioner on the basis of *S.E.C. v. Rogers,* 790 F.2d 1450; exclusion of the testimony of one of its witnesses; and comments rendered by the court during the course of trial. We address these claims briefly in disposing of them.

■ Petitioners contend that because *Saviano* was decided in the context of cross-motions for summary judgment without full disclosure of the entire mining operation, the Tax Court erred in following *Saviano*'s characterization of GFTD as a fraudulent sham and its disallowance of petitioners' mining deductions. Although the Tax Court here did follow the *Saviano* court's ruling concerning the tax consequences of the GFTD promotion, it did so only after giving petitioners every opportunity to challenge or otherwise expand the facts set forth in *Saviano.* Moreover, the Tax Court set forth its own extensive findings on the *modus operandi* of GFTD. Given the petitioners' failure to demonstrate that the GFTD promotion was anything other than the sham it was characterized as in *Saviano* and given that the financial underpinnings of the petitioners investments here were identical to those of petitioners in *Saviano,* we are not persuaded that it was error to follow *Saviano.* In fact, the Tax Court here went further than *Saviano* by refusing to allow the petitioners to deduct their initial cash outlay as mining expenses. *But see supra* note 5.

■ We also reject petitioners' collateral estoppel and res judicata claims. In reviewing these principles, the Court in *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), stated that "[u]nder collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Id.* at 153, 99 S.Ct. at 973 (citations omitted). Moreover, "[u]nder res judicata, a final judgment on the merits bars further

claims by parties or their privies based on the same cause of action." *Id.* (citations omitted). In *S.E.C. v. Rogers*, the Securities and Exchange Commission sued IME, its principal, Gerald L. Rogers, and eighteen others for purported securities law violations related to the offer and sale of IME GFTD investments. Although Rogers prevailed in the Tax Court and upon review in the Ninth Circuit, we note that *S.E.C. v. Rogers* did not entail *any* adjudication of tax liability. Because the cause of action (securities violations) in *Rogers* is distinct from the cause of action (tax liability) here, res judicata is unavailing to the petitioners. *See United States v. Mendoza*, 464 U.S. 154, 158 n. 3, 104 S.Ct. 568, 571 n. 3, 78 L.Ed.2d 379 (1984); *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). Moreover, collateral estoppel also is not applicable here because, in the context of tax cases, the doctrine "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation." *Sunnen*, 333 U.S. at 599–600, 68 S.Ct. at 720–721 (citations omitted). Again, because the issues in *Rogers* are distinct from those here, collateral estoppel is not applicable notwithstanding the fact that in both cases the issues arise from varying interpretations of the same factual predicate. Additionally, as noted in *Mendoza*, 464 U.S. 154, 104 S.Ct. 568, even if petitioners somehow could avail themselves of non-mutual offensive collateral estoppel, in which "a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *id.* at 159 n. 4, 104 S.Ct. at 572 n. 4,

such use is not permitted against the United States government. *Id.* at 158–59, 104 S.Ct. at 571–72.

■ Petitioner also challenges the Tax Court's exclusion of the testimony of William Hofius. Petitioners sought Hofius' testimony to establish that United States government harassment was responsible for their lack of profit from GFTD. Hofius' testimony was excluded as irrelevant because, although he was involved in business management matters related to the mining, he did not assume that position until 1982. Moreover, he lacked any information pertaining to petitioners' 1978–80 tax liability and was not qualified as a geologist capable of rendering an expert opinion regarding mineral property or mining operations.

Rule 401 of the Federal Rules of Evidence defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[8] Recognizing that the decision to admit or exclude evidence on the basis of relevance is left to the discretion of the trial court, *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1271 (6th Cir. 1988), we find no abuse of discretion in the Tax Court's exclusion of Hofius' testimony.

Finally, petitioners point to several court comments that allegedly reflect the court's bias toward their claim. We find that based on the extensive litigation emanating from the GFTD scheme, the court was well versed with the factual and legal underpinnings of petitioners' case. Nevertheless, the court gave the petitioners a full opportunity to distinguish their case from those previously litigated.[9] The court's comments more accurately reflect the fact that the petitioners were failing in their burden to distinguish their case by proving the validity of their investments and deduc-

---

8. The rules of evidence applicable in nonjury trials in the United States District Court for the District of Columbia are generally applicable to trials before the United States Tax Court. 26 U.S.C. Tax Ct.R. 31.

9. We note that several taxpayers have unsuccessfully appealed the Tax Court's determination at issue in this case. *See, e.g., Armstrong v. Commissioner,* 869 F.2d 1496 (9th Cir.1989); *Becker v. Commissioner,* 868 F.2d 298 (8th Cir.1989).

tions. Their failure to meet this burden is not tantamount to court prejudice.

The Tax Court's opinion is AFFIRMED in all respects.