T.C. Memo. 2009-251

UNITED STATES TAX COURT

COUNTRY PINE FINANCE, LLC, RICHARD A. PHILLIPS, TAX MATTERS
PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1399-07.              Filed November 5, 2009.

<u>Christopher Kliefoth</u> and <u>Karla L. Palmer</u>, for petitioner.

<u>Elizabeth R. Edberg</u>, <u>John W. Stevens</u>, and <u>Robert D.
Heitmeyer</u>, for respondent.

MEMORANDUM OPINION

GOEKE, <u>Judge</u>:  During 2001 the members of Country Pine

Finance, L.L.C. (Country Pine Finance), sold an unrelated

insurance business, generating gain and leaving them facing a

contingent tax liability.  The members entered into a Custom

Adjustable Rate Debt Structure (CARDS) transaction in order to

reduce their tax liabilities. The CARDS transaction generated a loss on Country Pine Finance's 2001 Form 1065, U.S. Return of Partnership Income. The issue for decision is whether Country Pine Finance is entitled to this loss. For the reasons stated herein, we find that Country Pine Finance is not entitled to the claimed loss.

The stipulations of fact and the attached exhibits are incorporated herein by this reference. Charles C. Burnham, Terry L. Stewart, Wayne R. Sharp, Jan P. Blick, Thomas E. Kolassa, Edward M. Burnham, David L. Burnham, James M. Burnham, James L. Harvin III, Thomas A. Reitan, John S. Avery, Richard A. Phillips (petitioner), John R. Bromley, and Stephen C. Adams were the members of Country Pine Finance during its existence (collectively, the members).

## Background

### 1. The Burnhams

Charles C. Burnham, Edward M. Burnham, David L. Burnham, and James M. Burnham are brothers. The four were involved in two business ventures: (1) Blue Marlin, a real estate business; and (2) Burnham Insurance Group (BIG), an insurance broker.

#### A. Burnham Insurance Group

Charles Burnham and his brothers formed BIG in 1978. BIG existed until its sale in 2001. Between 1978 and 2001 BIG merged with or acquired 12 other entities, usually smaller insurance

brokerages. Typically the owner of the merged or acquired entity would become a BIG stockholder. Most of the members other than the Burnhams became BIG shareholders through these mergers and acquisitions.

B. Blue Marlin

The Burnham brothers and two unrelated individuals, Al Ivany (Mr. Ivany), and George Markham (Mr. Markham), formed Blue Marlin in the 1980s to develop a corporate office park on Country Pine Lane in Calhoun, Michigan. The corporate park was made up of three buildings: (1) 100 Country Pine Lane; (2) 300 Country Pine Lane; and (3) 500 Country Pine Lane. Blue Marlin built the 100 and 500 Country Pine Lane buildings.

Later, Blue Marlin divested itself of its holdings. The 500 Country Pine Lane building was sold to three individuals, Thomas Kolassa (Mr. Kolassa), Don Karsten (Mr. Karsten), and Mills Mayo (Mr. Mayo). The 100 Country Pine Lane building was sold to Mr. Ivany. The 300 Country Pine Lane building was sold to BIG.

2. Sale to HUB

Sometime before 2001 the BIG stockholders decided to sell the company. At that time the members and four unrelated individuals owned 84 percent of the shares outstanding, with the remaining 16 percent owned by an employee stock ownership plan. The BIG stockholders decided to sell the company to HUB International (HUB). The stockholders of BIG and HUB entered

into an agreement and plan of merger whereby BIG was merged into a wholly owned subsidiary of HUB. The stockholders of BIG received shares of HUB stock and cash in exchange for their BIG shares.

BIG was valued by an appraiser before the stockholders entered into the merger agreement. However, one of BIG's business lines could not be valued accurately at that time. The parties to the merger agreement agreed that they would value that business line 2 years later, in 2003, and that if the results of that future valuation showed this business line to be worth more than originally thought, HUB might make additional payments to the BIG stockholders in 2003.

A. Requirements of Sale

During negotiations HUB informed the BIG stockholders that it was not interested in owning any real estate and would not purchase the 300 Country Pine Lane building. The stockholders decided to sell the 300 Country Pine Lane building to Country Pine Enterprises, L.L.C. (Country Pine Enterprises).

B. Country Pine Enterprises

Country Pine Enterprises was formed to hold the 300 Country Pine Lane building, which was conveyed to Country Pine Enterprises on June 29, 2001. Country Pine Enterprises then leased the 300 Country Pine Lane building to HUB. As a result, the BIG offices remained in the 300 Country Pine Lane building

after the merger.  Country Pine Enterprises later acquired the 500 Country Pine Lane building and some adjacent land.

C.  Results of Sale

On June 18, 2001, HUB and BIG executed a letter of intent whereby the stockholders of BIG agreed to sell their shares to HUB.  The merger was put into effect on July 20, 2001, through a subsidiary of HUB.  The stockholders of BIG received HUB stock and cash in exchange for their shares in BIG.  The BIG shareholders all recognized gain on the exchange of their stock and reported it on their individual Forms 1040, U.S. Individual Income Tax Return, for tax year 2001.  Facing large contingent tax liabilities as a result of this gain, the members sought ways to offset their gains.  One possible solution was a CARDS transaction.

3.  Introduction to CARDS

The members participated in a CARDS transaction in 2001. The transaction was developed by Chenery Associates, Inc. (Chenery).  The members decided to participate after viewing two presentations by Chenery.

A.  Chenery Associates, Inc.

Chenery was incorporated in 1993.  Roy Hahn (Mr. Hahn) was a principal at Chenery.  Chenery developed and marketed tax shelters and worked with different investment banks in New York to implement its transactions.  Chenery developed and implemented

numerous CARDS transactions, including the CARDS transaction at issue, and received fees for each. A portion of the fees was used to pay the third parties involved in the specific CARDS transaction and their counsel.

B. <u>Bob Baker</u>

Bob Baker (Mr. Baker) was an insurance executive who later founded his own wealth management company, Asset Strategies. Mr. Baker met Mr. Hahn in the mid-1990s, and they remained in contact during their careers. Mr. Hahn introduced Mr. Baker to the CARDS transaction.

Mr. Baker also met Mr. Kolassa during the mid-1990s. Mr. Baker became acquainted with BIG and the other BIG stockholders through Mr. Kolassa after Mr. Kolassa joined BIG. Later, Mr. Baker and David Burnham discussed tax planning before the BIG-HUB merger was consummated. Mr. Baker referred the members to Mr. Hahn.

C. <u>Miller Canfield</u>

Miller, Canfield, Paddock & Stone, P.L.C. (Miller Canfield), was a law firm located in Michigan. John Campbell was an attorney at Miller Canfield who provided legal advice to the members and Country Pine Finance on implementing the CARDS transaction. Mr. Campbell and Miller Canfield did not provide any advice to the members or Country Pine Finance other than in connection with the CARDS transaction.

D.  Decision To Enter Into a CARDS Transaction

On August 30, 2001, petitioner told Mr. Hahn that the members wanted to enter into a CARDS transaction.  The three parties involved were:  (1) Zurich Bank; (2) Fairlop Financial Trading, L.L.C. (Fairlop Trading); and (3) Country Pine Finance.

4.  The CARDS Transaction in General

A CARDS transaction has three phases:  (1) The loan origination phase; (2) the loan assumption phase; and (3) the operational phase.  In general, three parties are required to carry out a CARDS transaction:  (1) A bank; (2) a borrower; and (3) an assuming party.

A.  Loan Origination

During the loan origination phase, the bank agrees to lend funds to the borrower.  The borrower is a Delaware limited liability company with two members, both of whom are United Kingdom citizens to ensure that there are no U.S. income tax effects at the borrower level.  The bank requires the borrower to be capitalized in an amount equal to 3 percent of the funds to be borrowed.

The loan is typically for 30 years, with principal due after 30 years but interest due annually.  The credit agreement memorializing the loan imposes restrictions on what the loan proceeds can be used for.  Collateralization requirements imposed by the bank require the borrower to use the loan proceeds to

acquire highly stable items such as Government bonds or highly rated commercial paper.  After initially collateralizing the loan with high-value, stable assets, such as Treasury bonds or promissory notes from the bank, the borrower can substitute collateral and gain access to the loan proceeds.  In effect, the loan proceeds are initially used to purchase high-value items to serve as collateral for the loan until an equally high-value item can be swapped for the purchased items.  This swapping of collateral purportedly frees some of the loan proceeds to be used for investment purposes as the borrowers see fit.  However, the decision to swap collateral is not left to the discretion of the borrower.  The bank ultimately decides whether and on what terms a certain asset or security can be used as collateral.

B.  Loan Assumption

The second phase is the loan assumption phase--when the assuming party would assume a portion of the loan on behalf of the borrower.  The assuming party would receive only a portion of the loan proceeds but would agree to become jointly and severally liable for the entire amount of the original loan to the borrower.[1]  The assuming party would assume a portion of the loan

---

[1]Suppose the amount of the original loan from the bank to the borrower was $10 million.  The assuming party would assume a portion, $1 million, of the loan.  The $1 million would be transferred from the borrower to the assuming party, and in exchange the assuming party would become jointly and severally liable for the entire $10 million loan.

equal to the present value of the principal amount due in 30 years.

C. Operational Phase

The operational phase consists of periodic "reset dates". Each reset date allows the borrower to exchange collateral, with corresponding adjustments of the interest rate, and of the term until the next reset date. The decision to swap collateral or adjust the interest rate at a reset date is left to the discretion of the bank. If new collateral is proposed, it often results in a change of loan terms to reflect any adjustments to the amount of risk the parties face.

The purported purpose behind a CARDS transaction was to provide investment financing. A CARDS participant would enter into the CARDS transaction and use the assumed portion of the loan proceeds to make an investment. The investment property would then be swapped as collateral. In theory, the investment would be successful if the rate of return on the investment property exceeded the costs of entering into the CARDS transaction.

5. Country Pine Finance and Third Parties

A. Zurich Bank

Zurich Bank acted as the lender in the CARDS transaction at issue. Chenery had previously engaged Deutsche Bank in its transactions, but Mr. Hahn's contact at Deutsche Bank had moved

to Zurich Bank. Shortly thereafter Zurich Bank was engaged. ZCM Matched Funding Corp. acted as Zurich Bank's agent for purposes of the CARDS transaction.[2]

B. <u>Fairlop Trading</u>

Fairlop Trading, the borrower, was organized as a Delaware limited liability company on July 13, 2001, with Elizabeth A. D. Sylvester and Michael Sherry, citizens and residents of the United Kingdom, the members.

The Fairlop Trading members contributed $444,182 to Fairlop Trading. Cash of $6,296 was contributed with the remaining $437,885 due pursuant to notes payable. Fairlop Trading was set up solely to take part in this CARDS transaction.

C. <u>Country Pine Finance</u>

Articles of incorporation for Country Pine Finance were filed on November 14, 2001. A certificate of dissolution for Country Pine Finance was filed 1 year later, on November 14, 2002. Petitioner served as Country Pine Finance's tax matters partner at all relevant times.

The members made capital contributions to Country Pine Finance on November 21, 2001, and February 27, 2002, as follows:

| Member | 11/21/01 | 2/27/02 |
|---|---|---|
| Charles C. Burnham | $145,497 | $42,010 |
| Terry L. Stewart | 132,425 | 38,235 |

---

[2]We refer to Zurich Bank and ZCM Matched Funding Corp. as Zurich Bank for simplicity.

| | | |
|---|---|---|
| Wayne R. Sharp | 76,335 | 22,040 |
| Jan P. Blick | 48,720 | 14,067 |
| Thomas E. Kolassa | 61,761 | 17,832 |
| Edward M. Burnham | 41,087 | 11,863 |
| David L. Burnham | 36,063 | 10,413 |
| James M. Burnham | 32,862 | 9,488 |
| James L. Harvin, III | 31,483 | 9,090 |
| Thomas A. Reitan | 22,144 | 6,394 |
| John S. Avery | 21,651 | 6,251 |
| Richard A. Phillips | 24,550 | 7,088 |
| John R. Bromley | 17,807 | 5,141 |
| Stephen C. Adams | 17,613 | 5,085 |
| Total (rounded) | 710,000 | 205,000 |

Country Pine Finance was formed specifically to carry out the CARDS transaction. The amounts contributed were based on the amount of the fees to be paid to Chenery. A portion of the fees paid to Chenery was used to pay the third parties for their participation in the transaction.

6. The CARDS Transaction at Issue

    A. Origination

On November 9, 2001, Zurich Bank and Fairlop Trading entered into a credit agreement. Fairlop Trading was required to pledge collateral in order to borrow funds. Fairlop Trading entered into a master pledge and security agreement on November 9, 2001, in order to satisfy the collateral requirement.

Zurich Bank applied a "haircut" to any pledged collateral. The haircut varied depending on the type of collateral pledged. For example, promissory notes from Zurich Bank or cash would not be subject to a haircut, while long-term commercial paper might receive a 10-percent haircut. The effect of the haircut would be

to require the borrower to contribute or acquire additional assets to serve as collateral to make up for the haircut applied.

On December 4, 2001, Fairlop Trading informed Zurich Bank that it intended to borrow €16,613,000.  The notice of intent to borrow indicated that the €16,613,000 would be used to purchase assets from Zurich Bank to collateralize the loan.

On December 4, 2001, €16,613,000 was deposited into Fairlop Trading's Zurich Bank account.  The €16,613,000 was used to purchase two promissory notes from Zurich Bank, one for €13,662,660, the other for €2,990,340.  Both promissory notes matured on December 4, 2002, and were used to collateralize the €16,613,000 loan from Zurich Bank to Fairlop Trading.

Fairlop Trading borrowed €16,613,000 from Zurich Bank, then exchanged the €16,613,000 for Zurich Bank promissory notes worth €16,613,000.  This left Fairlop Trading owing Zurich Bank €16,613,000, and Zurich Bank owing Fairlop Trading €16,613,000.  The €13,662,660 and €2,990,340 promissory notes were pledged as collateral for the loan.  If Fairlop Trading defaulted on the loan, Zurich Bank could use the promissory notes to satisfy the debt.

Zurich Bank did not apply a haircut to promissory notes issued by Zurich Bank pledged as collateral, so no haircut was applied and Fairlop Trading did not have to contribute additional collateral.  The terms of the loan from Zurich Bank to Fairlop

Trading matched the terms of the promissory notes except that Fairlop Trading was required to pay 50 additional basis points of interest. This 50-basis-point spread served as a portion of the fees paid to Zurich Bank for entering into the CARDS transaction.

The €13,662,660 note remained with Fairlop Trading. The €2,990,340 note was later exchanged for a new note from Zurich Bank and €1,015,493.60. The note had a principal amount of €1,981,671.[3] Fairlop Trading immediately pledged the €1,981,671 note and the euro as collateral.

B. Assumption by the Members

On December 26, 2001, the members entered into a purchase agreement to purchase the €1,981,671 promissory note and €1,015,493.60 from Fairlop Trading. In exchange for the note and euro, the members agreed to become jointly and severally liable for the entire €16,613,000 loan from Zurich Bank to Fairlop Trading and waived any right of contribution against Fairlop Trading. The purported purpose of the waiver was to make the members fully liable for the entire €16,613,000 even if Fairlop Trading still maintained control over any portion of the proceeds. The members immediately pledged the promissory note and euro as collateral for the loan.

---

[3]The €6,824 difference between the value of the original note, €2,990,340, and the value of the new note and euro, €2,997,164, was due to interest received on the €2,990,340 promissory note.

The members contributed the €1,981,671 note and €1,015,493.60 to Country Pine Finance. In exchange, Country Pine Finance guaranteed the loan. Country Pine Finance claimed bases in the €1,981,671 promissory note and the €1,015,493.60 of $9,658,146 and $4,938,036, respectively. Country Pine Finance's claimed bases were based on the members' purportedly becoming jointly and severally liable for the entire €16,613,000.

Shortly thereafter Country Pine Finance pledged the €1,981,671 note and the €1,015,493.60 as collateral for the loan. Again all amounts lent by Zurich Bank were guaranteed by collateral purchased from Zurich Bank with those loan proceeds. None of the "liable" parties ever contributed any additional collateral. If Country Pine Finance had wanted to substitute collateral for the note and euro, Zurich Bank would have had to consent.

On December 28, 2001, Country Pine Finance and Zurich Bank entered into a cross-currency swap. Section 1.988-2(e)(2)(ii), Income Tax Regs., defines a currency swap contract as a contract involving different currencies between two or more parties to exchange periodic interim payments on or before maturity of the contract and exchange the swap principal amount upon maturity of the contract. The exchange of periodic interim payments is the exchange of a payment in one currency for a payment in another currency, with both payments being determined by reference to an

interest index applied to the swap principal amount.  Sec. 1.988-2(e)(2)(ii)(C), Income Tax Regs.

The cross-currency swap was a combination of an interest-rate swap and a foreign exchange forward contract.  Initially Country Pine Finance transferred the €2,997,640 to Zurich Bank, and Zurich Bank transferred $2,633,308 to Country Pine Finance. These were the notional amounts of the swap.

On December 28, 2001, the $2,633,308 Country Pine Finance received from Zurich Bank was used to purchase a promissory note with a principal amount of $2,633,308 from the bank.  The promissory note was then pledged as collateral.

The interest portion of the currency swap required Zurich Bank to pay to Country Pine Finance annual interest on the €2,997,162 at the euro Interbank Offered Rate (EURIBOR),[4] and Country Pine Finance to make monthly interest payments at the U.S. dollar London Interbank Offered Rate (LIBOR)[5] to Zurich Bank on the $2,633,308.

The interest-rate swap allowed petitioner to receive interest payments equal to the amount of interest it would eventually owe on the €1,981,671 note and the €1,015,493.60.

---

[4]Euro Interbank Offered Rate refers to the short-term rate of interest paid by one euro zone bank to another.

[5]London Interbank Offered Rate refers to the rate of interest paid when one bank borrows from another in the London interbank lending market.

The foreign exchange forward contract allowed Country Pine Finance to convert the $2,633,308 value of the promissory note purchased from Zurich Bank back into euro on December 4, 2002, at the same rate used to convert the euro into dollars on December 28, 2001.  This in effect would allow Country Pine Finance to end up in the same economic position upon the closing of the cross-currency swap as it was on the day it entered into the swap.  The cross-currency swap was closed out less than 1 year later on December 4, 2002.

C.  Operational Phase

The members asserted that the purpose for entering into the CARDS transaction was to finance a real estate investment. According to the members, they would purchase real estate and use the real estate as collateral.  If the members' investment was profitable, earnings from the real estate would exceed the costs of the CARDS transaction.

Zurich Bank told the members at the initiation of the CARDS transaction at issue that they would not be able to use real estate as collateral.  On October 30, 2001, Mr. Hahn sent petitioner an email informing him that Zurich Bank would not allow the members to swap commercial real estate as collateral for the loan at that time because Zurich Bank could not properly evaluate any possible real estate before the initiation of the CARDS transaction.  The members decided to enter into the CARDS

transaction even though it would be some time before real estate could possibly be used as collateral. The members decided to enter into the CARDS transaction in 2001 anyway because the tax loss was needed in 2001.

Real estate was never substituted as collateral, and neither the members nor Country Pine Finance ever attempted to substitute any specific piece of real estate as collateral. During 2002 petitioner made attempts to determine whether real estate in a general sense could be substituted, but the members never attempted to purchase or use a specific piece of real estate as collateral. Nor did the members have any specific piece of real estate evaluated by Zurich Bank for collateralization purposes. Likewise the members never attempted to substitute any type of collateral other than real estate for the promissory notes.

On August 15, 2002, Zurich Bank informed Fairlop Trading and the members that Zurich Bank was no longer willing to maintain the loan. All of the borrowed funds were paid back with the pledged collateral, and no additional capital contributions were ever made. Country Pine Finance was dissolved on November 14, 2002, by unanimous vote of the members.

7. Country Pine Finance's and Members' Returns

Country Pine Finance filed a Form 1065 for tax year 2001 on September 16, 2002, claiming a $7,917,051 net short-term capital loss on a "Euro Promissory Note" and a $4,045,820 loss on the

sale of business property.  The $4,045,820 loss was reported on a Form 4797, Sales of Business Property, as an ordinary loss on a "Euro Deposit".

The losses resulted from Country Pine Finance's swapping the note and euro for U.S. dollars as part of the cross-currency swap.  Country Pine Finance claimed a basis of $14,596,182 in the euro.  This was the U.S. dollar value of the initial loan from Zurich Bank to Fairlop Trading, €16,613,000.  The members claimed this high basis in the euro because of the members' agreeing to be liable for the amount of the entire loan from Zurich Bank to Fairlop Trading.

The euro were a nonfunctional currency within the definition of section 988.[6]  See sec. 1.988-1(c), Income Tax Regs.  When Country Pine Finance exchanged the €2,997,640 for $2,633,308, it claimed a loss on the disposition of the euro equal to the difference between $14,596,182 and $2,633,308.  Section 1.988-1(a)(1), Income Tax Regs., provides that disposition of a nonfunctional currency is a section 988 transaction.  Thus the members' transfer of the euro was treated as a section 988 transaction.  The loss was split between the promissory note and the euro.  This resulted in a $7,917,051 net short-term capital loss on the promissory note and a $4,045,820 loss on the euro.

_____

[6]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure.

Country Pine Finance filed a document titled "Disclosure Statement For Reportable Transaction Under Reg. 1.6011-4T" (the disclosure statement). The disclosure statement stated that Country Pine Finance had entered into a "Custom Adjustable Rate Debt Program" and that the principal tax benefits were the $7,917,000 short-term capital loss and the $4,045,000 ordinary loss. The disclosure statement further indicated that Country Pine Finance estimated a reduction in Federal income tax liability of its members for 2001 of $3,120,000 as a result.

Attached to the Form 1065 were Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., for all of the members. Each Schedule K-1 reported a member's share of the net short-term capital loss and the ordinary loss.

Each member filed his own Form 1040 reporting both his gains from the exchange of BIG stock and the claimed flow-through losses from Country Pine Finance. The losses from Country Pine Finance were used to offset the members' various gains on the disposition of BIG stock. However, some of the members decided not to claim all of the losses available to them, on the advice of their personal return preparers who had determined that the transaction might be challenged by the Internal Revenue Service (IRS). The percentage of the loss claimed by each member who did not claim the entire loss available to him was based on his

return preparer's estimation of a hypothetical future settlement with the IRS should the IRS challenge the transaction.

On October 17, 2006, respondent issued a notice of final partnership administrative adjustment (FPAA) to Country Pine Finance for taxable year 2001. The FPAA disallowed the claimed net short-term capital loss and the ordinary loss. The FPAA did not assert any penalties against Country Pine Finance or its members.

The FPAA included a document titled "Explanation of Adjustments" which provided numerous alternative arguments in support of the adjustments made in the FPAA, including that:

(1) The CARDS transaction lacked economic substance, was entered into primarily for tax-avoidance purposes, and was prearranged or predetermined;

(2) application of the substance-over-form or step-transaction doctrine would disallow the loss; or

(3) neither Country Pine Finance nor any member was entitled to a deduction under section 165, 465, or 988.

On January 17, 2007, petitioner filed his petition contesting the determinations in the FPAA. A trial was held on January 26-30 and February 5-6, 2009, at a special session of the Court in Chicago, Illinois. Both petitioner and respondent presented fact witnesses and expert witnesses.

Respondent submitted two expert reports prepared by Dr. A. Lawrence Kolbe (Dr. Kolbe) and Dennis Logue (Mr. Logue). Dr. Kolbe's report focused on a financial analysis of the CARDS transaction and the lack of rationality of entering into the CARDS transaction versus standard mortgage-based real estate financing. Mr. Logue's report evaluated the relationships among Zurich Bank, Fairlop Trading, and Country Pine Finance in the context of the banking industry and the bona fides of the purported loans. Mr. Logue concluded that the loan transactions to which Zurich Bank, Fairlop Trading, and Country Pine Finance were parties were not carried out in accordance with industry norms.

Petitioner submitted expert reports by Gordon L. Klein (Mr. Klein) and Frank A. De Lisi (Mr. De Lisi). Mr. Klein focused on Country Pine Finance's business purpose for entering into a CARDS transaction and whether Country Pine Finance could have generated a nontax economic profit from the CARDS transaction. Mr. De Lisi studied the documents memorializing the various stages of the CARDS transaction and concluded that it would have been reasonable for Zurich Bank to allow Country Pine Finance to substitute commercial real estate as collateral for the loan.

## Discussion

I.  TEFRA in General

Partnerships do not pay Federal income taxes, but they are required to file annual information returns reporting the partners' distributive shares of tax items.  Secs. 701, 6031. The individual partners then report their distributive shares of the tax items on their Federal income tax returns.  Secs. 701-704.  Upon formation a limited liability company with two or more members is treated as a partnership unless it elects to be treated as a corporation.  Sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs.  Country Pine Finance did not elect to be treated as a corporation and thus is treated as a partnership for Federal income tax purposes.

To remove the substantial administrative burden occasioned by duplicative audits and litigation and to provide consistent treatment of partnership tax items among partners in the same partnership, Congress enacted the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402, 96 Stat. 648.  See Randell v. United States, 64 F.3d 101, 103 (2d Cir. 1995); H. Conf. Rept. 97-760, at 599-600 (1982), 1982-2 C.B. 600, 662-663.

Under TEFRA, all partnership items are determined in a single partnership-level proceeding.  Sec. 6226; see also Randell v. United States, supra at 103.  The determination of partnership

items in a partnership-level proceeding is binding on the partners and may not be challenged in a subsequent partner-level proceeding. See secs. 6230(c)(4), 7422(h). This precludes the Government from relitigating the same issues with each of the partners.

In partnership-level proceedings such as the case before us, the Court's jurisdiction is limited by section 6226(f) to a redetermination of partnership items and penalties on those partnership items. Section 6231(a)(3) defines the term "partnership item" as any item required to be taken into account for the partnership's taxable year under any provision of subtitle A of the Code to the extent the regulations provide that such item is more appropriately determined at the partnership level than at the partner level. The loss claimed on Country Pine Finance's Form 1065 is a partnership item properly determined at a partnership-level proceeding. Sec. 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs.

## II. Burden of Proof

Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving that he is entitled to the deductions claimed. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The burden of proof on factual issues that affect a taxpayer's liability for tax may be

shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue." Sec. 7491(a)(1). Petitioner does not claim that the burden shifts to respondent under section 7491(a). In any event, petitioner has failed to establish that he has satisfied the requirements of section 7491(a)(2). On the record before us, we find that the burden of proof does not shift to respondent under section 7491(a).

III.  Economic Substance Doctrine

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, even if a transaction is in formal compliance with Code provisions, a deduction will be disallowed if the transaction is an economic sham. Am. Elec. Power Co. v. United States, 326 F.3d 737, 741 (6th Cir. 2003).

The parties have not formally stipulated where an appeal of this case will lie. At trial counsel for both petitioner and respondent indicated that appeal would likely lie with the Court of Appeals for the Sixth Circuit, and both petitioner and respondent focus on caselaw of that circuit in their posttrial briefs. However, absent stipulation to the contrary, appeal may lie in the Court of Appeals for the District of Columbia Circuit

because Country Pine Finance was dissolved.  See sec. 7482(b)(1) (flush language).  Whether appeal lies in the Court of Appeals for the Sixth Circuit or the District of Columbia Circuit does not affect our decision.

The Court of Appeals for the Sixth Circuit has stated that "'The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses.'"  Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006) (quoting Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987)).  "[W]hen 'it is patent that there [is] nothing of substance to be realized by [the taxpayer] from [a] transaction beyond a tax deduction,' the deduction is not allowed despite the transaction's formal compliance with Code provisions."  Am. Elec. Power Co. v. United States, supra at 741 (quoting Knetsch v. United States, 364 U.S. 361, 366 (1960)).  "If the transaction has economic substance, 'the question becomes whether the taxpayer was motivated by profit to participate in the transaction.'"  Dow Chem. Co. v. United States, supra at 599 (quoting Illes v. Commissioner, 982 F.2d 163, 165 (6th Cir. 1992), affg. T.C. Memo. 1991-449).  "'If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes,'" id., and no subjective inquiry into the taxpayer's motivation is made, id. at 599.  A

court "will not inquire into whether a transaction's primary objective was for the production of income or to make a profit, until it determines that the transaction is bona fide and not a sham." Rose v. Commissioner, supra at 853.

In Horn v. Commissioner, 968 F.2d 1229, 1239 (D.C. Cir. 1992), revg. Fox v. Commissioner, T.C. Memo. 1988-570, the Court of Appeals for the D.C. Circuit stated that a transaction lacked economic substance if: (1) The taxpayer had no business purpose other than obtaining tax benefits in entering the transaction; and (2) the transaction lacks any reasonable possibility of earning a profit. See also Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97, affd. in part and remanded in part 331 F.3d 972 (D.C. Cir. 2003). The test in Horn is disjunctive; satisfaction of either prong satisfies the conditions for a determination that the subject transaction has economic substance. Countryside Ltd. Pship. v. Commissioner, T.C. Memo. 2008-3 n.20.

IV. Petitioner's Arguments

Petitioner argues that the CARDS transaction had economic substance and was entered into to permit Country Pine Finance to finance real estate investments on the members' behalf. Petitioner contends that the CARDS transaction satisfies both the objective and subjective requirements of the economic substance test and that the claimed loss should be allowed.

Petitioner argues that the CARDS transaction had legal significance to Country Pine Finance and the members because the loans were bona fide and the members were jointly and severally liable for the entire €16,613,000. Petitioner also argues that Fairlop Trading, the members, and Country Pine Finance were all at risk for the loan proceeds.

Petitioner focuses on the profit potential of the CARDS transaction as if real estate had been substituted for collateral and points to his expert reports in support of this contention. Petitioner argues that if real estate had been allowed as collateral, the members would have used the proceeds to invest in real estate and attempt to earn a profit.

V. Respondent's Arguments

Respondent argues that the claimed loss should be disallowed because the CARDS transaction lacked economic substance and that the members did not have a nontax reason for entering into the transaction.

Respondent first argues that the CARDS transaction lacked economic substance and had no practical effect other than the creation of income tax losses because: (1) The initial loan, (2) the members' assumption of the loan and contribution to the capital of Country Pine Finance, and (3) the members' entering into the cross-currency swap served no purpose other than the creation of tax losses. Respondent argues that none of the

parties were ever at risk because the various credit agreements required Fairlop Trading and Country Pine Finance to pledge high-value collateral and it was in Zurich Bank's discretion to allow any collateral to be swapped. Respondent argues that Zurich Bank would not allow collateral to be swapped because it would be against Zurich Bank's financial interest to do so, as it would expose the bank to unnecessary risk.

Respondent disagrees that we should evaluate the CARDS transaction as if Country Pine Finance had been able to substitute real estate as collateral. Respondent contends that this would be inappropriate because any potential profit from an investment in real estate that the members could earn would be profit from a separate transaction, not the transaction that gave rise to the tax loss at issue. Respondent further contends that whatever profit Country Pine Finance may or may not have been able to earn from substituting collateral, the artificial tax losses at issue would remain. Respondent contends that even if we were to assume that real estate could be substituted, the substitution would result in an entirely new loan between Zurich Bank and Country Pine Finance because it would require the parties to negotiate new loan terms. Respondent concludes that because substitution of real estate would lead to an entirely new loan, the initial CARDS transaction that was consummated and

carried out would have been irrelevant to the real estate financing but for the tax losses generated.

Respondent next argues that even if we were to accept that the initial loan and assumption were necessary and that real estate could be substituted as collateral, the new loan would still be a sham designed solely to achieve tax benefits because Country Pine Finance and its members had no chance of making a profit on any future real estate investment. Respondent points to his expert witness reports and argues that Country Pine Finance would still not earn a profit because Zurich Bank would require onerous loan terms requiring payments that would far exceed any potential profit. Respondent contends that in order for Country Pine Finance to make a profit, Zurich Bank would have to both allow real estate as collateral and agree to loan terms that would be contrary to its own financial interests.

In the alternative respondent argues that even if we find that the CARDS transaction had economic substance, the loss should be disallowed because the members participated in the CARDS transaction only in order to create an artificial tax loss. Respondent contends that Country Pine Finance fails the subjective prong because testimony of the members shows that they had no knowledge or understanding of the CARDS transaction, did not read, review, or remember the CARDS transaction documents, and decided to enter into the transaction for the tax loss.

Respondent points to the members' failure to research or obtain any assurance of the availability of real estate as collateral both before and after they entered into the CARDS transaction as evidence that the members were just after the tax loss and not truly interested in financing a real estate investment.

VI. Analysis

A. Objective Analysis

We begin by analyzing the objective profit potential of the transaction giving rise to the claimed tax loss. The transaction giving rise to the loss was the swap of €2,997,164 for $2,633,308 as part of the cross-currency swap. Country Pine Finance claimed a basis totaling $14,596,182 in the euro and the promissory note. As a result of this inflated basis, Country Pine Finance claimed losses totaling $11,962,871 when it received the $2,633,308 from Zurich Bank as part of the cross-currency swap.

There were no third parties in this transaction. Country Pine Finance, Fairlop Trading, and Zurich Bank were involved specifically to enter into this CARDS transaction. Fairlop Trading's operating agreement indicates that its only purpose was the CARDS transaction, it could not enter into any other business transactions, and it was never able to access the loan proceeds. The CARDS transaction consisted of prearranged steps entered into to generate a tax loss; the loan proceeds were never at risk and

the transaction giving rise to the tax loss was cashflow negative.

None of the loan proceeds ever left Zurich Bank's control, as both Fairlop Trading and Country Pine Finance used Zurich Bank accounts. Although Country Pine Finance and the members purportedly became liable for the loan proceeds, the various loan agreements required Fairlop Trading, the members, and Country Pine Finance to immediately pledge trustworthy collateral for those loan amounts. The proceeds of the initial loan from Zurich Bank to Fairlop Trading were used to purchase promissory notes from Zurich Bank that were then used to collateralize the initial loan. The members immediately pledged the €1,981,671 note and the €1,015,493 as collateral after assuming the loan. Later, Country Pine Finance immediately pledged the euro contributed by the members as collateral for the loan that it now guaranteed. After the euro were swapped for dollars as part of the cross-currency swap, the $2,633,108 received was used to purchase a promissory note from Zurich Bank as collateral for that amount. There was no chance that Zurich Bank, Fairlop Trading, or the members would ever lose any money on the CARDS transaction other than fees. See Am. Elec. Power Co. v. United States, 326 F.3d at 743 (holding that in corporate-owned life insurance plan, although individual parts of transaction represented actual transfers of risk among parties, overall structure of

transaction ensured that no risk existed for taxpayer at overall plan level).

The members knew in October 2001 that they would not be able at that time to substitute real estate as collateral. Because the parties knew that they would not be able to substitute real estate as collateral and that the only collateral that would be accepted by Zurich Bank without the bank's imposing a haircut was Zurich Bank promissory notes, the members knew that they would have to purchase Zurich Bank promissory notes and pledge them as collateral. Because the members knew that they would be using Zurich Bank promissory notes as collateral, they knew that they would never truly be at risk for any of the loan proceeds.

After entering into the CARDS transaction, none of the parties ever made any additional contributions to capital or ever attempted to use the loan proceeds. Once the loans came due, the various promissory notes were used to pay back the loans. The terms and interest rates of the currency swap and the forward contract allowed Country Pine Finance to back out of the transactions without paying any amounts other than the fees required as part of the transaction.

If we look past the predetermined steps, the CARDS transaction lacks economic substance because it was cashflow negative. Respondent's expert Dr. Kolbe testified that the CARDS transaction had a negative net present value and rate of return

relative to the capital invested.  Both calculations indicate that the CARDS transaction was cashflow negative.

Dr. Kolbe calculated the net present value and rate of return relative to capital by reference to the amounts Country Pine Finance received and paid out as part of the CARDS transaction.  After taking into account fees and interest, Dr. Kolbe calculated that Country Pine Finance received about €2.2 million on December 28, 2001, and paid back €3.1 million on December 4, 2002.  Applying the relevant cost of capital at the time the members decided to enter into the transaction, 3.806 percent,[7] resulted in the transaction's having a negative net present value of €771,042.  Dr. Kolbe also calculated that Country Pine Finance paid nearly 36 percent interest on the loan, significantly higher than the relevant cost of capital, 3.806 percent.  Dr. Kolbe concluded that Country Pine Finance had no possibility of profit and that any use of the loan proceeds would create a material and unnecessary drag on that investment.

We find this testimony accurate.  Country Pine Finance paid more than $700,000 in order to borrow €2,997,164 for 1 year.  Those funds were then used to purchase investments that would never earn a profit.  Because the restrictions imposed by Zurich Bank meant that Country Pine Finance would never be able to

---

[7]This figure is the EURIBOR on that date plus 50 basis points, as required by the loan terms.

substitute collateral that could earn a profit, the transaction would always be cashflow negative. The CARDS transaction was always a losing proposition from a nontax perspective because for Country Pine Finance to earn a profit, Zurich Bank would have to allow the substitution of collateral that would earn more than the cost of the initial loans without imposing any more onerous terms than the ones in place when the transaction was initiated. This would have been against Zurich Bank's economic interests because it would have exposed Zurich Bank to increased risk without a corresponding economic benefit. See Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987) (in commodities-trading-based tax shelter, grant of complete discretion over transaction in one party is curious in face of alleged risk involved and lack of experience of taxpayers), affg. 85 T.C. 127 (1985); New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. at ___ (slip op. at 33). As it was initially structured, the CARDS transaction resulted in interest payments to Zurich Bank without the bank's facing any economic risk because the loans were guaranteed with Zurich Bank promissory notes. Zurich Bank had no reason to allow Country Pine Finance to substitute collateral because it would have exposed the bank to increased risk without a corresponding financial benefit. Although Zurich Bank could have adjusted the loan terms to account for this increased risk, for example by

increasing the interest rate, the adjustment in loan terms would have negatively affected Country Pine Finance. Country Pine Finance would have had to either provide additional capital for collateral purposes or pay higher interest on the loan. This would have resulted in higher costs and an increased negative cashflow.

Country Pine Finance argues that we should look at the CARDS transaction as if real estate could have been substituted, but we must look at the transaction that gave rise to the tax loss. See Am. Elec. Power Co. v. United States, 326 F.3d at 744. As respondent points out, the substitution of real estate would have been a separate transaction from the one giving rise to the tax benefit. That transaction is separate from any hypothetical future swap of real estate as collateral, and any profit from the real estate investment would not be a profit from the CARDS transaction. See id. ("Money generated by means of abusive tax deductions can always be applied to beneficial causes, but the eventual use of the money thus generated is not part of the economic-sham analysis."). Even if we were to find that the CARDS transaction had a profit potential if real estate were substituted, the claimed loss generated by the currency swap would remain.

The substitution of real estate would have created a new transaction with new terms. Each reset date allowed Country Pine

Finance to swap collateral, but this would require Zurich Bank to evaluate the new collateral and determine whether any haircut would apply. Further, the parties would also have to negotiate new terms, including the applicable interest rate and term until the next reset date.

Petitioner's arguments overlook the fact that the members entered into the transaction having reason to believe that real estate could not be used as collateral. The possibility of real estate as collateral was never explored before the decision to enter into the CARDS transaction, and the record indicates that petitioner knew in October 2001 that real estate could not be substituted. The members and Country Pine Finance never received confirmation from Zurich Bank that real estate could be substituted. The members likewise did not determine whether real estate had been allowed as collateral in any of the other Chenery-implemented CARDS transactions. Further, if Zurich Bank was applying a haircut to highly stable corporate and U.S. Treasury bonds, it is not credible that a long-term real estate investment would be allowed without a substantial haircut that would require the members to contribute additional collateral or pay substantially higher fees.

As of October 2001, before the initiation of the CARDS transaction, petitioner knew that any potential real estate could not be evaluated, and thus could not used as collateral.

However, the members decided to forge ahead with the CARDS transaction even though there was no real estate investment to finance.  The members entered into the CARDS transaction in 2001 in order to generate losses that could be used to offset the gain on the exchange of the BIG stock.  Petitioner testified that the reason the members decided to enter into the transaction in 2001 was the tax benefit even though Zurich Bank could not evaluate real estate.

Further, Mr. Miller testified that the members had hoped to revisit the CARDS transaction in 2003 in regard to the second BIG business line.  The members were interested in revisiting the CARDS transaction to generate additional losses in 2003 if the subsequent valuation of BIG's second business line, discussed supra page 4, had resulted in additional payments from HUB to the BIG shareholders, resulting in additional gains.

Country Pine Finance and the members engaged in a transaction in order to create a tax loss.  The transaction had no profit potential and was cashflow negative.  Even if we accept that real estate could be substituted as collateral and that Country Pine Finance would earn a profit on that real estate, the artificial loss would remain.  This artificial loss would be unrelated to the hypothetical real estate financing arrangement. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1358 (Fed. Cir. 2006); see also Kornman & Associates, Inc. v. United

States, 527 F.3d 443, 456 (5th Cir. 2008) ("The Trust acknowledges that it only suffered a $200,000 economic loss in connection with these transactions, yet it claimed a $102.6 Million tax loss on its return."); Cemco Investors, LLC v. United States, 515 F.3d 749, 750-751 (7th Cir. 2008); New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. ___ (slip op. at 33); Maguire Partners-Master Invs., LLC v. United States, 103 AFTR 2d 2009-763, at 2009-772, 2009-1 USTC par. 50,215, at 87,444 (C.D. Cal. 2009) ("First, the claimed basis is fictional, because * * * [taxpayers] paid only $1.5 million and $675,000, * * * but gained an increased basis of $101,500,000 and $45,675,000, respectively."); Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d 885, 894 (E.D. Tex. 2007), affd. in part and vacated in part 568 F.3d 537 (5th Cir. 2009). This is not the case of a business decision with only two possible outcomes, gain or loss, having resulted in a loss. Rather, a real estate investment would not make legitimate the loss incurred on the CARDS transaction. Although petitioner asks us to evaluate the transaction as if real estate could have been substituted as collateral we must look at the transaction giving rise to the tax loss at issue; an illegitimate loss cannot be grafted onto a hypothetical legitimate transaction.

B.  Subjective Analysis

The claimed loss is also disallowed because the members did not have a nontax business purpose for entering into the CARDS transaction.  Although the members testified that the decision was made to secure financing for future real estate investments, that testimony is not credible.  There is substantial evidence that the decision to enter into the CARDS transaction was solely tax motivated.

The members knew or had reason to know in October 2001 that real estate could not be substituted at that time but decided to enter into the CARDS transaction anyway.  The decision to go ahead even without real estate as viable collateral was driven by the desire for a tax loss.  Petitioner testified that the decision to enter into the transaction in 2001 was to take advantage of the tax benefits.  Notes taken by the members during the Chenery presentations focused on the tax benefits, and the members never researched or evaluated an investment in real estate.

The members repeatedly testified that they did not read any of the relevant documents but only signed the signature pages. Jan Blick, Stephen Adams, Thomas Reitan, Edward, James, and David Burnham, John Bromley, Thomas Kolassa, John Avery, and James Harvin all testified that they did not remember and in any event would not have bothered to read any of the transaction documents.

Further, most of the members testified that they had no knowledge of Zurich Bank, Fairlop Trading, or CARDS in general. The members' lack of due diligence in researching the CARDS transaction indicates that they knew they were doing nothing more than purchasing a tax loss and not entering into a legitimate business or financing transaction with any nontax objectives. See Pasternak v. Commissioner, 990 F.2d 893, 901 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181.

The members' claim to have a nontax motive for Country Pine Finance's serving as a financing vehicle and their becoming jointly and severally liable for €16,613,000 in exchange for only €2,997,640 is undercut by the fact that none of the members performed any research into the CARDS transaction, performed any economic analysis of a possible real estate investment, or read any of the documents memorializing the transaction. The members all had business backgrounds and had owned or coowned their own businesses before joining BIG. In spite of these backgrounds, the members entered into the transaction without bothering to read any of the documents they signed, even though they were purportedly becoming liable for €16,613,000. It is not credible that the members would voluntarily make themselves liable for that amount without reading any of the memorializing documents. The fact that the members never bothered to verify that real estate could be substituted as collateral for the loan proceeds

undercuts the claimed reason for the CARDS transaction in the first place.

Most of the members were involved in the purchase of the 300 Country Pine Lane building by Country Pine Enterprises. Had the members really been interested in financing possible real estate purposes, their collective business experiences should have shown how contrived the CARDS transaction was. Wayne Sharp testified that he entered into the CARDS transaction even though he was not interested in financing real estate. The other members testified in only the most general terms that the purpose behind Country Pine Finance was to finance real estate. However, none of the members ever truly investigated how such financing would work. The record shows that the members entered into the CARDS transaction solely for the tax loss and did not have a legitimate business purpose. Accordingly, Country Pine Finance likewise fails the subjective requirement of Rose v. Commissioner, 868 F.2d 851 (6th Cir. 1989).

C. Conclusion

The CARDS transaction lacked economic substance and stood no chance of earning a profit. The members did not have a nontax business purpose for entering into the CARDS transaction. Because we find that the CARDS transaction lacked economic substance, it is disregarded for tax purposes and Country Pine Finance's claimed loss is disallowed.

To reflect the foregoing,

Decision will be entered

for respondent.